IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHELLY MILLS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 10-4324 |
| | : | |
| TEMPLE UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

YOHN, J.                                                                           April 3, 2012

Plaintiff, Shelly Mills, brings this action against Temple University ("Temple"), alleging claims of discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq*., violations of the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 *et seq*., and violations of the due-process clause of the Fourteenth Amendment to the United States Constitution. Mills, a secretary, suffered a back injury at work that interfered with her ability to complete tasks involving lifting and filing. Mills claims that Temple discriminated against her in violation of the ADA by refusing to accommodate her disability and by instead requiring her to take unpaid FMLA leave. She also alleges that Temple retaliated against her for requesting a disability accommodation by placing her on unpaid leave. Although Mills had previously been granted intermittent FMLA leave to attend doctors' appointments for her back injury, Temple requested an additional healthcare certification, which Mills claims constitutes unlawful interference under the FMLA. Currently before me is Temple's

motion for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth below, I will grant in part and deny in part Temple's motion.

## I.     Factual Background and Procedural History[1]

Mills began working for Temple University Hospital in 1998 as a patient interviewer. (Def.'s Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Facts") ¶ 1; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Counterstatement of Facts ("Pl.'s Facts") ¶ 93.)[2] In 2007, she accepted a bargaining-unit position as a secretary in Temple's Cardiology Department. (Def.'s Facts ¶¶ 2, 4; Pl.'s Facts ¶¶ 4, 94.) Mills's job duties included supporting nursing staff with clerical duties, making appointments, producing letters, pulling charts, and filing. (Pl.'s Facts ¶ 6.) She spent approximately one hour a day filing. (*Id*. ¶ 96.)

Mills's employment was relatively uneventful—she received positive job reviews and worked well with her co-workers—until July 23, 2008. (Def.'s Facts ¶¶ 8-9; Pl.'s Facts ¶ 97.) While typing at her desk that day, Mills was struck in the back by a co-worker and flung

---

[1] Except as otherwise noted, the following facts are undisputed.

[2] Temple filed its motion for summary judgment on September 1, 2011. Mills filed her response in opposition on September 21, 2011. In her response, Mills "adopt[ed] into this Memorandum of Law the facts that were outlined at length in the Plaintiff's Response to Defendant's Undisputed Facts and the Plaintiff's Counterstatement of Facts." (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Resp.") at 3.) However, Mills neglected to file her counterstatement of facts at that time. Temple filed a reply in support of its motion on September 28, 2011, noting this omission. Mills filed her counterstatement of facts the very day, September 29, 2011. Although this counterstatement appears untimely, I will nevertheless consider it, as it is "merely a tool for the Court's ease of decision" and simply directs my attention to facts in Mills's timely filed exhibits, which I can and must consider in ruling on this motion for summary judgment. *Cf. Lue-Martin v. March Group*, 379 F. App'x 190, 193 (3d Cir. 2010) (not precedential). Furthermore, I note that Temple has not filed a motion to strike the counterstatement of facts.

forward.[3] (Def.'s Facts ¶¶ 9-10; Pl.'s Facts ¶ 98.) She did not report the incident to her supervisor, human resources, or her union that day. (Def.'s Facts ¶ 11; Pl.'s Facts ¶ 11.) However, she began experiencing severe pain within days of the incident. (Def.'s Facts ¶ 15; Pl.'s Facts ¶¶ 15, 99.) By the end of the following week, Mills reported the incident; a workers' compensation incident report was completed and Mills was referred to a physician in Temple's Occupational Health Unit. (Def.'s Facts ¶¶ 15-16; Pl.'s Facts ¶¶ 15-16.)

Mills was initially treated by Dr. Evelyn Balogun in Temple's Occupational Health Unit. (Def.'s Facts ¶ 17; Pl.'s Facts ¶ 101.) Dr. Balogun examined Mills and ran several tests including an X-ray and a bone scan. (Def.'s Facts ¶ 17; Pl.'s Facts ¶¶ 17.) Although Dr. Balogun was unable to diagnose Mills during her initial visit she gave her a medicated topical cream for pain and continued to see her approximately once a week until December 2008. (Def.'s Facts ¶ 18; Pl.'s Facts ¶ 101.) After each appointment, Dr. Balogun released Mills to return to work without imposing any restrictions on her activities. (Def.'s Facts ¶ 19; Pl.'s Facts ¶ 19.) Ultimately, Dr. Balogun referred Mills to Dr. Ray Moyer, an orthopedist, before releasing her from workers' compensation medical care altogether. (Def.'s Facts at 3 n.3; Pl.'s Facts ¶ 18.)

Dr. Moyer prescribed Naprosyn[4] to Mills for pain management and recommended physical therapy three times a week. (Def.'s Facts at 3 n.3; Pl.'s Facts ¶ 102.) Dr. Moyer referred Mills to Dr. Stanley Michaels, also an orthopedist, who in turn referred her to Dr. Tayron. (Pl.'s

---

[3] Mills alleges that her back was also injured in a second incident involving another co-worker at a later date. (Def.'s Fact at 3 n.2.) The details of this incident are not material to the motion before me.

[4] Naprosyn is the trademark preparation of naproxen, which is a nonsteroidal anti-inflammatory drug used in the treatment of pain. *Dorland's Illustrated Medical Dictionary* 1251 (31st ed. 2007) [hereinafter *Dorland's*].

Facts ¶ 103, 105.) Mills saw Dr. Tayron only once around February 2009 and received a "pain

management shot" during her appointment. (Pl.'s Facts ¶ 105.)

During this time when Mills was being treated by various physicians, she continued to

work without any doctor-imposed, work-related restrictions. (Def.'s Facts ¶ 19; Pl.'s Facts ¶ 19.)

Nevertheless, Mills experienced pain in her back while working and had difficulty lifting and

filing patient charts. (Pl.'s Facts ¶¶ 19, 106.) Mills's supervisor, Anthony Morlino, the senior

administrator for the Cardiology Department, was aware that Mills was in pain, as Mills

discussed the matter with him on four or five separate occasions between July 2008 and August

2009. (*Id.* ¶¶ 89, 107.) And between early 2009 and mid-2009, Mills asked Morlino for

assistance with filing on several occasions. (*Id.* ¶ 108.) In reality, student interns and permanent

Temple staff took over filing for Mills toward the end of 2008, (*id.* ¶¶ 19, 106), a fact that Mills

shared with Maureen Murphy, her direct supervisor (*id.* ¶ 109).

Outside of work, Mills continued to engage in daily activities such as driving, caring for

her herself and her daughter, and shopping. (Resp. Ex. A, Dep. of Shelly Mills (March 16, 2011)

("Mills Dep.") at 67:13-16; 70:18-24.) However, Mills struggled with these daily activities,

which she found exhausting. (*Id.* at 67:13-24.) Mills enrolled in a ballet class in the fall of 2008,

but found that she could no longer exercise to the extent she had previously been accustomed.

(*Id.* at 69:9-24; 70:6-15.)

After being released from workers' compensation medical care in December 2008, Mills

contacted the Human Resources Department about how to pursue a workers' compensation

claim. (Def.'s Facts ¶ 22; Pl.'s Facts ¶ 22.) Ultimately, her claim was unsuccessful. (Def.'s Facts

at 4 n.4.) Because Mills was using sick time in order to attend her doctors' appointments,

Morlino suggested that she apply for FMLA leave to protect these periodic absences. (Def.'s Facts ¶ 23; Pl.'s Facts ¶ 23.) Mills contacted Thomas Johnston, the director of workers' compensation and absence management at Temple, regarding the availability of and process of applying for FMLA leave. (Def.'s Facts ¶ 24; Pl.'s Facts ¶ 24.) Johnston provided Mills with information regarding her eligibility for intermittent FMLA leave and did not discourage her from taking FMLA leave. (Def.'s Facts ¶ 26; Pl.'s Facts ¶ 26.)

At Temple, when an employee believes that he or she is eligible for FMLA leave, he or she contacts the Benefits Department. (Pl.'s Facts ¶ 117.) Upon receiving a request for information pertaining to the FMLA, the Benefits Department provides the employee with a "leave request" form, a "release of medical information" form, and a healthcare provider certification (the "Certification"). (Pl.'s Facts ¶¶ 120-21.) After the completed forms have been returned, Johnston reviews them to ensure that each has been properly filled out. (Resp. Ex. K, Dep. of Thomas F. Johnston (April 14, 2011) ("Johnston Dep.") at 35:10-18.)

Mills received the FMLA paperwork in early 2009 and filed her first application for intermittent leave around February 24, 2009. (Def.'s Facts ¶¶ 30-31; Pl.'s Facts ¶¶ 30-33, at 16 n.2.) Dr. Michaels, Mills's healthcare provider at the time, completed the Certification. (Pl.'s Facts ¶ 125.) On the certification, in response to the question that asks, "Is the employee unable to perform any of his/her job functions due to the condition?" he answered "yes." (*Id*. ¶ 126.) Mills's application was conditionally denied on March 5, 2009, because Dr. Michaels had not properly completed the Certification. (Def.'s Facts ¶ 31; Pl.'s Facts ¶¶ 31, 129.) Mills contacted human resources concerning the denial and was instructed to have Dr. Michaels clarify the information he provided on the Certification, particularly his diagnosis. (Def.'s Facts ¶ 32; Pl.'s

Facts ¶ 32.) Because Dr. Michaels had only seen Mills once, he declined to provide a diagnosis

or complete the Certification. (Def.'s Facts ¶ 33; Pl.'s Facts ¶ 33.) As a result, Mills's first

request for intermittent FMLA leave was denied on March 18, 2009. (Def.'s Facts ¶ 34; Pl.'s

Facts ¶¶ 34, 130.)

     After being discharged from Dr. Michael's care, Mills began treating with Dr. Sanjay

Gupta, a pain-management specialist, around April 2009. (Def.'s Facts ¶ 37; Pl.'s Facts ¶ 37.) On

April 16, 2009, Dr. Gupta noted that Mills had disc "desiccation with disc bulging eccentric to

C2-3 and to [the] right at C5-6." (Resp. Ex. F at 1.) Dr. Gupta treated Mills for approximately six

months, and she received bi-monthly epidural injections for her back pain. (Def.'s Facts ¶ 37;

Pl.'s Facts ¶ 37.)

     Mills applied a second time for intermittent FMLA leave in May 2009. (Resp. Ex. B at 1.)

Dr. Gupta completed the Certification for her application, in which he noted that Mills had a

thoracic MRI that was positive for disc degeneration and a cervical MRI that was positive for

disc degeneration and bulging. (*Id*. at 4.) He further described Mills as suffering from Kyphosis.[5]

(*Id*.) Dr. Gupta also answered "yes" to the question, "Is the employee unable to perform any of

his/her job functions due to the condition?" (*Id*.) In response to the next question, "identify what

job functions the employee is unable to perform," Dr. Gupta wrote, "having trouble filing, etc."

(*Id*.)

     Although Mills's second application for intermittent FMLA leave was approved, the

parties offer different accounts as to what occurred between Mills's filing and Temple's

---

[5] Kyphosis is "abnormally increased convexity in the curvature of the thoracic spinal
column." *Dorland's* at 1007.

approval. (Def.'s Facts ¶ 39; Pl.'s Facts ¶ 39.) According to Johnston, when he read the

Certification and Dr. Gupta's description of Mills's difficulty filing, he asked Susan Latorre, an

employee in his office, to clarify the nature of the restrictions. (Johnston Dep. at 81:9-24.)

Evidently, Johnston expected Latorre to write a letter to Mills or Dr. Gupta asking for

clarification—did Mills have difficulty filing for only a few days immediately following an

epidural injection, in which case she could use FMLA protected leave, or was this a work-related

restriction that applied beyond a brief recovery period following each injection? (*Id.* at 81:9-

82:13.) Johnston claims that Dr. Gupta told Latorre over the telephone that the restrictions "are

only after she gets a shot." (*Id.* at 82:24-83:2.) Dr. Gupta, however, maintains that he never had

such a conversation with Johnston or Latorre, and that Mills was actually restricted from filing

before, during, and after her injections. (Resp. Ex. R at 1.) In any event, Mills was informed by

letter dated June 3, 2009, that she had been approved "for intermittent FMLA leave from

5/26/2009 to 11/26/2009." (Resp. Exhibit S at 1.) And she took FMLA leave periodically until

July 1, 2009. (Pl.'s Facts ¶ 136.)

In June 2009, the student intern who had been helping Mills with her filing left for the

summer and the unattended filing began to pile up. (Def.'s Facts ¶ 44; Pl.'s Facts ¶ 44.) On June

23, 2009, Murphy, Mills's supervisor, circulated an email asking several members of the staff,

including Mills, to assist with the filing. (Def.'s Facts ¶ 45; Pl.'s Facts ¶¶ 45, 137.) Mills

responded the next day by email: "I am not able to handle filing at this time; By doing so could

further injure [m]y back. I have been organizing the loose files to prepare them to be filed. I am

always happy to assist in the growth and development of the department. If you need further

documentation please inform me." (Resp. Ex. C at 1.) Murphy informed Mills that she would

7

need documentation if she was unable to file. (Def.'s Facts ¶ 47; Pl.'s Facts ¶ 139.) Mills

inquired whether a copy of the FMLA certification would suffice, but Murphy asked for a letter

from her doctor instead. (Pl.'s Facts ¶ 139.) On July 2, 2009, Mills gave Murphy a letter from Dr.

Gupta stating, "She has disc degeneration with radiating cervicothoracic. She is getting

interventional spine injection treatment for her condition. She can work restrictive duty with no

bending, lifting, filing, pushing or pulling and weight bearing activity."[6] (Pl.'s Facts ¶ 142; Resp.

Ex. D at 1.)

On July 7, 2009, Murphy forwarded Dr. Gupta's letter to Morlino. (Def.'s Facts ¶ 51;

Pl.'s Facts ¶ 142.) Morlino immediately contacted Johnston to discuss how the matter should be

handled. (Def.'s Facts ¶ 52; Pl.'s Facts ¶ 143.) Johnston inquired whether there was any way they

could help Mills file, or if there were any student interns available to help. (Johnston Dep. at

121:11-23.) Morlino responded that filing was an essential function of Mills's job and that she

had to do it. (*Id.*) At the conclusion of the five- to fifteen-minute conversation, Johnston told

Morlino that they should send Mills home and offer her continuous FMLA leave. (*Id.* at 121:17-

23; 139:10-140:1.) Neither consulted Mills, Dr. Gupta, or Temple's Office of Labor and

Employment before deciding to send Mills home. (Pl.'s Facts ¶¶ 147-51.)

Later that same day, Morlino sent Mills an email explaining that he had received the letter

from her doctor concerning her work restrictions and "[t]herefore we will be unable to continue

your services in your position. You are of course eligible for FMLA [leave] . . . . Should you

produce a letter indicating you may return to full, unrestricted duty, we will consider your return

---

[6] Mills herself estimates that she could not lift more than three pounds at that time. (Mills Dep. at 237:6-18.)

to the position." (Resp. Ex. T at 1.) Upon receiving the email, Mills called Morlino to discuss the matter. (Pl.'s Facts ¶ 153.) Morlino did not return her phone call that day, and Mills finished her regular shift. (*Id*. ¶ 154.) Mills left the next day for a week-long vacation that she had previously planned. (Def.'s Facts ¶ 55; Pl.'s Facts ¶ 155.)

The morning after her vacation (approximately July 15 or July 16), when Mills had been scheduled to return to work, she called Murphy to discuss how to proceed and Murphy referred her to human resources. (Def.'s Facts ¶ 56; Pl.'s Facts ¶¶ 56, 156.) Mills visited human resources in person and was informed that she could not return to work and was provided with an application for continuous FMLA leave. (Def.'s Facts ¶ 57; Pl.'s Facts ¶ 157.) After receiving the application, Mills contacted Johnston for clarification. (Def.'s Facts ¶ 61; Pl.'s Facts ¶ 158.) Johnston explained the differences between intermittent and continuous FMLA leave. (Def.'s Facts ¶ 62; Pl.'s Facts ¶ 62.) Mills told Johnston that she objected to taking unpaid leave for an injury that occurred on the job and did not understand the need to complete another Certification when she had already been approved for FMLA leave. (Pl.'s Facts ¶¶ 64, 159.) According to Mills, Johnston informed her that she could either "do the twelve weeks without pay or get an attorney." (Pl.'s Facts ¶ 160.) Mills returned home, paperwork in hand. (Def.'s Facts ¶ 60.)

Mills never completed the application for continuous leave. (Def.'s Facts ¶ 64; Pl.'s Facts ¶ 64.) And after being sent home, she did not abide by Temple's call-in procedure for absences. (Def.'s Facts ¶ 65; Pl.'s Facts ¶ 65.) Temple contacted Mills to remind her of the deadline for submitting her paperwork and granted her extensions of that deadline on more than one occasion. (Def.'s Facts ¶¶ 63, 66; Pl.'s Facts ¶¶ 63, 66.) When Temple did not receive her paperwork by

August 18, 2009, it sent her a letter terminating her employment for being absent without authorization. (Def.'s Facts ¶ 68; Pl.'s Facts ¶ 68.)

Since her termination, Mills has not found other employment, although she has applied for several positions. (Def.'s Facts ¶ 76; Pl.'s Facts ¶ 76.)  Mills has pursued a certification in medical billing and coding, which requires her to take two buses and wheel her eight- to ten-pound backpack to class. (Mills Dep. at 100:5-13.) She lost her health insurance following her dismissal and therefore stopped seeking medical care for her condition in December 2009. (*Id*. at 169:5-172:1.) Today, Mills experiences minimal pain that she treats with Motrin or a prescription muscle relaxer. (*Id*. at 170:7-20.)

Mills filed this action against Temple on August 25, 2010, alleging discrimination and retaliation in violation of the ADA (counts I and II, respectively), interference with her rights under the FMLA (count III), and due process violations (count IV). After discovery, Temple filed this motion for summary judgment.

## II.    Standard of Review

A motion for summary judgment will be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (internal quotation marks and citations omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**III.     Discussion**

Temple seeks summary judgment in its favor on all four counts of the complaint. Temple

argues that summary judgment is appropriate on the claim of discrimination in violation of the

ADA (count I) because Mills is not disabled within the meaning of the ADA, or alternatively,

because she was reasonably accommodated. As to count II, the ADA retaliation claim, Temple

contends that Mills's claim fails not only because she is unable to establish a prima facie case of

retaliation, but also because she is unable to adduce any evidence to suggest that Temple's

legitimate reason for placing Mills on leave was pretextual. Temple seeks summary judgment on

Mills's claim that Temple violated her rights under the FMLA (count III) on the ground that

Temple did not interfere with, restrain, or deny Mills's exercise of FMLA rights. Finally, Temple

seeks summary judgment in its favor on count IV, the due-process claim.

I will deny Temple's motion with respect to counts I, II, and III because genuine disputes

as to material facts make summary judgment inappropriate. Because Mills does not object to

summary judgment with respect to count IV, I will grant Temple's motion as to that claim.

**A.     ADA Failure to Accommodate (Count I)**

The ADA "prohibits certain employers from discriminating against individuals on the

basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999) *superceded*

*in part*, ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008).

The statute provides: "No covered entity shall discriminate against a qualified individual with a

disability because of the disability of such individual in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under

12

the ADA encompasses not only such disparate treatment but also the failure to provide a reasonable accommodation for an individual's disability. The ADA provides that an employer engages in discrimination when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case of discrimination under the ADA, Mills must show that (1) she has a disability within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by her employer; and (3) she has suffered an adverse employment decision as a result of discrimination. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). Temple argues that summary judgment is appropriate because Mills is not disabled as a matter of law, and in any event, she was reasonably accommodated. I disagree.

### 1.     Does Mills Have a Disability?

A plaintiff such as Mills can establish that she has a disability by demonstrating that she has "a physical or mental impairment that substantially limits [a] major life activit[y]," 42 U.S.C. § 12102(2)(A), has "a record of such an impairment," *id.* § 12102(2)(B), or is "regarded as having such an impairment," *id.* § 12102(2)(C). The parties do not dispute that Mills's back injury constitutes an impairment under the ADA; the issue here is whether Mills's condition substantially limits a major life activity. To analyze a claim under the first subsection of the definition of disability, a court must first identify the specific life activities that the plaintiff claims are affected and determine whether those activities are "major life activities" under the

13

ADA, and then must evaluate whether the plaintiff's impairment substantially limits those major

life activities. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306-07 (3d Cir. 1999).

The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553

(2008), became effective on January 1, 2009, and applies to this case because Mills was removed

from her position on July 7, 2009. Congress amended the ADA to broaden its scope by

expanding the definition of disability, which had been narrowed by Supreme Court interpretation.

*See id*. (finding that Supreme Court precedent, such as *Toyota Motor Mfg., Ky., Inc. v. Williams*,

534 U.S. 184 (2002), and regulations promulgated by the Equal Employment Opportunity

Commission had narrowed the definition of disability in a manner inconsistent with

congressional intent). With the passage of the ADAAA, Congress expanded the statute's non-

exhaustive list of "major life activities" and declared that "[t]he definition of disability shall be

construed in favor of broad coverage of individuals under this Act, to the maximum extent

permitted by the terms of this Act." Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122

Stat. 3553, 3555. Major life activities include "performing manual tasks, seeing, hearing, eating,

sleeping, . . . *lifting*, bending, speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working." 42 U.S.C. § 12102(2)(A) (emphasis added).

Additionally, the ADAAA requires a "less searching analysis" of whether a plaintiff is

"substantially limited." *Kravits v. Shinseki*, No. 10-861, 2012 U.S. Dist. LEXIS 24039, at *17

(W.D. Pa. Feb. 24, 2012). The EEOC has noted that under the ADAAA, "substantially limits" is

"not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i) and (iii). "Rather, 'the

determination of whether an impairment substantially limits a major life activity requires an

individualized assessment,' and should 'require a degree of functional limitation that is lower

14

than the standard for 'substantially limits' applied prior to the ADAAA.'" *Cohen v. CHLN, Inc.*, No. 10-514, 2011 U.S. Dist. LEXIS 75404, at *20 (E.D. Pa. July 13, 2011). Ultimately, whether an individual is substantially limited as to a major life activity is a question of fact. *Williams,* 380 F.3d at 763.

Temple argues that Mills does not meet the definition of disabled because she is not substantially limited in any major life activity. Specifically, Temple points to Mills's testimony that she has continued to perform day-to-day activities (i.e., caring for herself and her daughter, driving, shopping, attending classes, and commuting on the bus or train) since being injured, that she has not treated with a healthcare professional since December 2009 or taken medication since that time, and that she worked without interruption until July 2009.

However, these statements, when considered in context and in light of other evidence in the record, do not foreclose a finding that Mills was disabled. To begin, "the determination of whether a person was a 'qualified individual with a disability' for the purposes of an ADA claim is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made." *Bowers v. NCAA*, 475 F.3d 524, 535-536 (3d Cir. 2007). In the period of time before Mills was placed on unpaid leave, her work was not "uninterrupted" as Temple suggests. Rather, Mills took sick leave in order to attend doctors' appointments after her back injury in 2008, and took intermittent FMLA leave in 2009 in order to recuperate from epidural injections. (Def.'s Facts ¶¶ 23, 41; Pl.'s Facts ¶¶ 23, 41.) Furthermore, Mills received help with filing from her co-workers and interns. (Pl.'s Facts ¶¶ 19, 106.) Mills testified that she stopped seeing a physician in December 2009 because she lost her health insurance after she was terminated by Temple. (Mills Dep. at at 169:5-172:1.) I will not

15

hold this hardship against her. Moreover, Mills took various pain medications—Naprosyn, a muscle relaxer, and Motrin—following her injury. (Def.'s Facts at n.3; Pl.'s Facts ¶ 102; Mills Dep. at at 170:7-20.) Finally, although Mills continued to engage in daily activities and chores following her injury, she struggled to complete them, and found small tasks such as brushing her daughter's hair to be painful and exhausting. (Mills Dep. at 67:13-24; 70:18-24.)

Mills argues that she was substantially limited in her ability to lift.[7] Indeed, the record contains evidence that supports such a conclusion. Mills testified that she was restricted from lifting anything weighing more than three pounds. (Mills Dep. at 237:6-18.) Moreover, she made changes to her lifestyle that are consistent with such a restriction: she asked for help stocking supplies and filing large patient charts at work; she ceased lifting weights as part of her exercise routine; and she used a rolling backpack to transport her eight- to ten-pound schoolbooks instead of a shoulder bag. (*Id*. at 55:3-21, 174:20-175:8.) Additionally, Dr. Gupta's testimony suggests

---

[7] Under the pre-amendment standards of the ADA, Mills's restriction on lifting more than three pounds may not have sufficed to establish her as disabled under the Act. *See Marinelli v. City of Erie*, 216 F.3d 354, 364 (3d Cir. 2000) (holding that a plaintiff who was restricted from lifting more than ten pounds was not substantially limited within the meaning of the ADA). However, Congress directed that under the amended Act, "the definition of disability shall be construed in favor of *broad coverage* of individuals under this Act, to the *maximum extent* permitted by the terms of this Act.  Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555 (emphasis added). Bearing this instruction in mind, courts have found plaintiffs with less severe lifting restrictions than Mills to be disabled under the ADAAA. *See Molina v. DSI Renal, Inc.*, No. 11-28, 2011 U.S. Dist. LEXIS 139889, at *16-22 (W.D. Tex. Dec. 5, 2011) (finding that a reasonable juror could conclude that an individual limited to lifting less than twenty pounds was disabled under a state statute that has been amended to reflect the amendments embodied in the ADAAA); *Williams v. UPS*, No. 10-1546, 2012 U.S. Dist. LEXIS 23079, at *16-20 (D.S.C. Jan. 31, 2012) (report and recommendation adopted in relevant part by *Williams v. UPS*, No. 10-1546, 2012 U.S. Dist. LEXIS 23080, at *10 (D.S.C. Feb. 23, 2012)) (concluding that a plaintiff with a permanent restriction on lifting more than twenty pounds could be disabled under the ADAAA).

that the restrictions on Mills's ability to lift, file, bend, push, and pull were doctor-imposed, not self-imposed by Mills as Temple implies. (Resp. Ex. R at 1.)

Under the less restrictive standard of the ADAAA, I find that Mills has offered sufficient evidence to raise a genuine issue of fact as to whether she was disabled at the time she was removed from her position and placed on leave.[8]

## 2.    Did Temple Discriminate Against Mills by Failing to Provide a Reasonable Accommodation?

"[A]n employer discriminates against a qualified individual with a disability when the employer does 'not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Taylor*, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)). To determine the appropriate reasonable accommodation, the employer should initiate the interactive process. *See* 29 C.F.R. § 1630.2(o)(3). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app. § 1630.9. Both parties bear responsibility in this process. *Taylor*, 184 F.3d at 312.

---

[8] I need not address Mills's argument that her ability to work is substantially limited because I conclude that a reasonable factfinder could find that she is substantially limited in her ability to lift. *See* 29 C.F.R. pt. 1630 app. § 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

An employee such as Mills can demonstrate that her employer failed to engage in the interactive process by showing (1) "the employer knew about the employee's disability"; (2) "the employee requested accommodations or assistance for his or her disability"; (3) "the employer did not make a good faith effort to assist the employee in seeking accommodations"; and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319-20. Temple challenges the sufficiency of Mills's evidence as to each of these four elements.

First, Temple contends that it did not know of Mills's disability. An employer's duty to engage in the interactive process is contingent upon its knowledge of the employees disability. "The employer must have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (quoting *Taylor*, 184 F.3d at 313). Temple's argument is implausible. There is more than ample evidence to suggest that Temple knew of Mills's back condition: Mills's back injury occurred at work and was documented in a workers' compensation incident report; Mills sought medical care from Temple's Occupational Health Unit; Mills filed two healthcare provider certifications as part of Temple's FMLA application process that identified her as unable to perform functions of her job as a result of her condition; Mills spoke with her supervisors, Morlino and Murphy, about her condition; and in July 2009 Mills presented Murphy with a letter from Dr. Gupta describing her condition in response to Murphy's request for documentation of her injury. (Def.'s Facts ¶¶ 15-16; Pl.'s Facts ¶¶ 15-16,

126, 139, 142; Resp. Ex. B; Resp. Ex. D). Taken together, a rational trier of fact could easily find that Temple knew of Mills's disability.

Second, Temple argues that Mills never requested accommodation for her disability. "[E]ither by direct communication or other appropriate means, the employee 'must make clear that [he/she] wants assistance for his or her disability.'" *Conneen*, 334 F.3d at 332 (quoting *Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000)). "The law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation . . . [and] circumstances will sometimes require the employer to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Id*. at 332 (internal quotation marks, citations, and alterations omitted).

Again, I find that there is sufficient evidence of record for a reasonable juror to conclude that Mills informed Temple of her need for assistance. Mills testified that she had several conversations with Morlino and Murphy about her difficulty filing in which she requested help from student interns to complete the task. (Pl.'s Facts ¶¶ 108-09). Additionally, in the healthcare provider certification completed by Dr. Gupta, he wrote that Mills was "having trouble filing." (Resp. Ex. B at 5.) Although Temple argues that Dr. Gupta later informed a Temple employee that this only applied immediately following an epidural injection when Mills needed to recuperate, Dr. Gupta denies ever having had such a conversation. (Resp. Ex. R at 1.) I must accept his version of the facts for summary-judgment purposes. On June 24, 2009, in response to a request to spend time filing, Mills wrote to Murphy: "I am not able to handle filing at this time;

19

By doing so could further injure [m]y back. I have been organizing the loose files to prepare them to be filed. I am always happy to assist in the growth and development of the department. If you need further documentation please inform me." (Resp. Ex. C at 1.) Temple's ADA specialist acknowledged that when an employee tells a supervisor that they cannot perform a certain function of their job, that can be a means of requesting accommodation under the ADA. (Resp. Ex. G, Dep. of Dierdre Culbreath-Walton (June 16, 2011) at 33:11-17.) In response to Mills's email, Murphy requested documentation and Mills provided her with a letter from Dr. Gupta describing her condition and work-related restrictions. (Resp. Ex. D.) In light of this evidence, a genuine dispute of fact exists as to whether Mills made a request for accommodation, which must be resolved by a jury at trial—not by me on summary judgment.

Third, Temple contends that Mills cannot prove that Temple acted in bad faith. Employers such as Temple can demonstrate that they participated in the interactive process in good faith by showing, for example, that they met with the employee who requested the accommodation, they requested information about the employee's condition and limitations, they asked the employee what accommodation she desired, they considered the employee's request, and they discussed alternative accommodations if the requested accommodation was too burdensome. *Taylor*, 184 F.3d at 317. Where "there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Id*. at 318. However, "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997).

Specifically, Temple maintains that its offer of unpaid continuous FMLA leave was a reasonable accommodation and demonstrates good faith.[9] I find the Third Circuit's decision in *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 770 (3d Cir. 2004) instructive. There, a police officer requested a duty reassignment to accommodate his disability. *Id*. at 756-57. His employer responded by offering him extended unpaid leave, which much like Temple, the employer maintained was an offer to reasonably accommodate him. *Id*. at 771. The Third Circuit held that "a fact-finder could conclude that . . . [the employer's] offer of extended unpaid leave was not a good faith response to [plaintiff's] request for [accommodation]." *Id*. at 772. Thus, Temple's offer of unpaid leave does not establish, as a matter of law, that it acted in good faith. A reasonable jury could find that an offer of unpaid leave was a reasonable accommodation—but it could also find that it was not when a "modest and fairly obvious" slight change in the job responsibilities of Mills, or the use of an intern or volunteer, could have relieved Mills of her one-hour-per-day lifting and filing duties.

---

[9] In support of this position, Temple cites *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004), and *Wilson v. Lemington Home for the Aged,* 159 F. Supp. 2d 186, 201 (W.D. Pa. 2001). Neither of these cases determines the outcome in the matter before me.

In *Conoshenti*, the Third Circuit did not hold as a matter of law that an offer of leave is always a reasonable accommodation as Temple suggests, but merely noted in dicta that "the federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future." 364 F.3d at 151. Temple has not identified any evidence to suggest that a leave of absence would have allowed Mills to recover from her back injury so that she would be able to resume filing in the near future.

In *Wilson*, the district court considered whether an employee's request for medical leave could be considered a request for reasonable accommodation. 159 F. Supp. 2d at 201. Again, the court did not hold that it was reasonable as a matter of law, but instead concluded that "there remains a genuine issue as to whether Plaintiff's request for medical leave constitutes a reasonable accommodation in this case under the ADA." *Id*.

Temple also asserts that any breakdown in the interactive process is the fault of Mills, not Temple. Specifically, Temple emphasizes that Mills never returned her application for continuous FMLA leave despite numerous reminders and that she "never reached out to [Temple] after the decision to offer her leave as an accommodation." (Def.'s Reply Brief in Supp. of Mot. for Summ. J. ("Reply") at 5.) It is true that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Taylor*, 184 F.3d at 312 (internal quotation marks omitted). However, Mills did contact Morlino, Murphy, and human resources after receiving the email removing her from her position as secretary. (Def.'s Facts ¶¶ 56-57; Pl.'s Facts ¶¶ 56-57, 153, 156.) Furthermore, Temple took few, if any, of the steps identified as demonstrating good faith by the Third Circuit in *Taylor*. 184 F.3d at 317. Temple did not meet with Mills following its receipt of Dr. Gupta's letter; nor did Temple inquire about Mills's condition or limitations, or ask what accommodation she desired. (Resp. Ex. E, Dep. of Anthony Morlino (March 25, 2011) ("Morlino Dep.") at 71:10-12; 72:15-73:1.) Rather, Morlino and Johnston discussed the matter between themselves for five to fifteen minutes and immediately rejected the idea of hiring a student intern to help with filing despite the fact that an intern had been doing just that for over six months. (Johnston Dep. 121:11-23; 139:10-140:1.) Summary judgment on this issue is inappropriate because a factual dispute exists as to whether Temple acted in good faith.

Finally, Temple urges me to conclude that Mills could not have been reasonably accommodated. "Generally, the question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002). Once a plaintiff shows that a proposed accommodation is possible, the burden shifts to the defendant to prove, as

an affirmative defense, that the requested accommodation is unreasonable or would cause an undue hardship. *See Turner v. Hershey Chocolate USA*, 440 F.3d 604, 614 (3d Cir. 2006). Mills proposed that student interns help her file large patient charts. Mills, who received just this assistance between late 2008 and June 2009, has carried her burden of demonstrating that the accommodation was possible. Furthermore, the testimony of Morlino suggests that the Cardiology Department traditionally hired students interns, that Morlino had the authority to make such hiring decisions, that the interns were typically paid between $7 and $10 per hour (a portion of which was subsidized by federal financial aid), and that the Cardiology Department had the budget to hire such interns in June 2009. (Morlino Dep. at 56:9-58:21.) This is sufficient to raise a genuine issue of fact as to the reasonableness of Mills's proposed accommodation.

Viewing the facts in the light most favorable to Mills, I find that material issues of fact exist as to whether Temple made a good-faith effort to assist Mills in seeking accommodation. Therefore, I will deny Temple's motion for summary judgment as to count I.

**B.     ADA Retaliation (Count II)**

The ADA prohibits an employer from retaliating against an employee for engaging in certain protected conduct. *See* 42 U.S.C. § 12203(a). The statute provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." *Id.*

Courts analyze ADA retaliation claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Williams*, 380 F.3d at 759 n.3. Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of

23

retaliation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). To establish a prima facie case, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* at 500.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action. *See id.* "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997).

Finally, if the defendant articulates such a reason, "the plaintiff must be able to convince the factfinder both that the [defendant's] proffered explanation was false, and that retaliation was the real reason for the adverse . . . action." *Krouse*, 126 F.3d at 501. Although the burden of production shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Temple contends that it is entitled to summary judgment on Mills's retaliation claim because Mills cannot establish a prima facie case of retaliation and, in any event, Temple has offered a legitimate, nonretaliatory reason for its actions and Mills has submitted no evidence demonstrating that there is a genuine issue of material fact about whether this reason is merely a pretext for retaliation. I will address each argument in turn.

24

1.      **Mills's Prima Facie Case**

Mills argues that she engaged in protected employee activity, the first element of a prima

facie case of retaliation, when she requested an accommodation pursuant to the ADA. Although

requesting a reasonable accommodation does not appear to "fit[] within the literal language of

the statute," *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997), the Third Circuit

has held that a good-faith request for an accommodation is protected activity under the ADA's

antiretaliation provision, *see Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir.

2003); *accord Soileau*, 105 F.3d at 16 ("It would seem anomalous . . . to think Congress intended

no retaliation protection for employees who request a reasonable accommodation unless they also

file a formal charge."). Temple once again argues that Mills never made a request for an

accommodation. For the reasons set forth above in Part III.A.2 of the memorandum, I conclude

that there is a genuine factual dispute that precludes summary judgment on this issue.

According to Mills, Temple's decision to remove her from her position and offer her

unpaid FMLA leave was an adverse employment action that satisfies the second element of her

prima facie case.[10] To sustain a retaliation claim, "a plaintiff must show that a reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (U.S. 2006) (internal

---

[10] Temple also claims that Mills was paid after being removed from her position on July 7, 2009, until she was terminated on August 18, 2009. (Reply at 6.) Mills, however, testified that she was not paid for the entirety of that period. (Mills Dep. 153:21-154:13.) This material dispute of fact must be decided by a jury.

quotation marks and citations omitted).[11] Temple reiterates that FMLA leave is an acceptable

form of accommodation under the ADA and therefore cannot be an adverse employment action. I

disagree. A reasonable employee might well be dissuaded from requesting an accommodation by

the threat of being sent home from work without pay. *See Morales v. Ga. Dep't of Human Res.*,

No. 7:08-156, 2010 U.S. Dist. LEXIS 118154, at *44-45 (M.D. Ga. Nov. 8, 2010) (collecting

cases that hold that requiring an employee to take leave without pay could be considered an

adverse employment action). In other words, a reasonable factfinder could conclude that

involuntary unpaid leave is materially adverse.

Next, Temple argues that there is no evidence of a causal connection—the third element

of a prima facie case of retaliation—between Mills's protected activity and Temple's adverse

action. Specifically, Temple disputes the significance of temporal proximity in this case. The

Third Circuit has stated that "the mere fact that adverse employment action occurs after [a

protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating

a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d

Cir. 1997) *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53,

68 (U.S. 2006). However, the court has gone on to clarify that if the timing of the alleged

---

[11] *Burlington* involved a retaliation claim under Title VII of the Civil Rights Act of 1964, not the ADA. 548 U.S. at 56. Nevertheless, the Third Circuit has previously stated that "retaliation claims under the ADA are analyzed under the same framework as Title VII discrimination claims." *Shellenberger*, 318 F.3d at 188. And the district courts of this circuit have applied the adversity standard enunciated in *Burlington* to claims of retaliation in violation of the ADA. *See, e.g., Boandl v. Geithner,* 752 F. Supp. 2d 540, 561-62 (E.D. Pa. 2010); *Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 500 (E.D. Pa. 2010); *Hemby-Grubb v. Ind. Univ. of Pa.*, No. 06-1307, 2008 U.S. Dist. LEXIS 72481, at *19 (W.D. Pa. Sept. 22, 2008).

retaliatory action is "'unusually suggestive' of retaliatory motive" a causal link will be inferred.[12]
*Krouse*, 126 F.3d at 503 (citing *Robinson*, 120 F.3d at 1302). The Third Circuit has inferred a
causal link where only two days passed between the plaintiff's protected activity and the adverse
employment action, but refused to do so where slightly over two months had elapsed. *Compare
Jalil*, 873 F.2d at 708 (stating that plaintiff "demonstrated the causal link . . . by the circumstance
that the discharge followed rapidly, only two days later, upon [the employer's] receipt of notice
of [his] EEOC claim"(citation omitted)), *with Williams*, 380 F.3d at 760 (finding that two months
was not so close as to be "unduly suggestive").

　　　Here, the proximity of Mills's presentation of the letter from Dr. Gupta describing her
work-related restrictions to Temple's decision to place her on leave supports an inference that
there was a causal connection between the two. On July 7, 2009, Murphy forwarded Dr. Gupta's
letter to Morlino and Morlino immediately contacted Johnston to discuss how to proceed. (Def.'s
Facts ¶ 51-52; Pl.'s Facts ¶ 142-43.) It took Morlino and Johnston five to fifteen minutes to
decide to remove Mills from her job and place her on unpaid leave. (Johnston Dep. at 121:17-23;

---

[12] The Third Circuit has noted that it is "seemingly split" on the question whether the
timing of the allegedly retaliatory action can, by itself, support a finding of causation. *Robinson*,
120 F.3d at 1302; *Krouse*, 126 F.3d at 503. However, the court has cautioned that "this 'split' is
not an inconsistency in our analysis but is essentially fact-based." *Farrell v. Planters Lifesavers
Co.*, 206 F.3d 271, 279 (3d Cir. 2000). Thus, the evidentiary value of temporal proximity to the
causation factor will depend upon "the stage of the *McDonnell Douglas* proof analysis, and the
procedural circumstance." *Id*. at 279 n.5. When a plaintiff is relying upon temporal proximity to
satisfy her prima facie case for the purpose of summary judgment under *McDonnell Douglas*,
close temporal proximity can, by itself, support a finding of causation. *See Jalil v. Avdel Corp.*,
873 F.2d 701, 708 (3d Cir. 1989); *cf. Smith v. Allen Health Sys*., 302 F.3d 827, 833 (8th Cir.
2002) (stating that the *McDonnell Douglas* system of proof "requires only a minimal showing
before requiring the employer to explain its actions" (citation omitted)); *James v. New York
Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (finding that a plaintiff's burden on presenting a
prima facie case under *McDonnell Douglas* is "minimal").

139:10-140:1.) Mills received an email that same day stating that Temple would be unable to continue her services in her position. (Resp. Exhibit T at 1.) These events, which occurred during the course of one workday, are even closer in time than the 24-hour sequence I considered to be sufficient to establish causation in *Reinhart v. Mineral Techs., Inc.*, No. 05-4203, 2006 U.S. Dist. LEXIS 89279, at *33-35 (E.D. Pa. Nov. 27, 2006).

Thus, I find that Mills has carried her burden of establishing a prima facie case of retaliation.

### 2.    Evidence of Pretext

Under the *McDonnell Douglas* framework, the burden shifts to the Temple to articulate a legitimate, nonretaliatory reason for the adverse action. "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]." *Woodson*, 109 F.3d at 920 n.2. To meet this burden, Temple simply states, "Plaintiff's work-related restrictions indicated that she could not perform the essential functions of her position and providing her with a leave of absence was the only way to accommodate her." (Reply at 6.) Despite citing no authority in its favor, I find that Temple's proffered legitimate, non-retaliatory reason for placing Mills on leave meets the "relatively light" burden required at this stage of the analysis, and thus I will proceed to the next stage, pretext. *See EEOC v. Aldi, Inc.*, No. 06-1210, 2008 U.S. Dist. LEXIS 25206, at *60-63 (W.D. Pa. Mar. 28, 2008) (concluding that plaintiff's failure to perform essential functions of the job is a legitimate nonretaliatory reason for dismissal).

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, [nonretaliatory] reasons for its action, the plaintiff must point to some

28

evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To discredit the employer's stated reason, a plaintiff such as Mills "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons." *Id.* (internal quotation marks, brackets, and citations omitted).

Mills testified that she ceased filing from late 2008 to July 2009, during which time co-workers and interns were completing the task instead. (Pl.'s Facts ¶ 109.) Mills's supervisors were aware of the situation and tolerated her refusal to file for more than seven months—a fact that is clearly inconsistent with the conclusion that filing was an essential function of Mills's job. Although Temple now insists that a leave of absence was the only way to accommodate Mills, Temple had previously accommodated her by allowing an intern to help with the filing. Drawing all reasonable inferences in favor of the non-moving party, Mills, as I must on summary judgment, I conclude that Temple's actions could lead a rational juror to disbelieve its articulated legitimate reason.

In sum, genuine disputes of fact make summary judgment as to Mills's ADA retaliation claim inappropriate and I will deny Temple's motion as to count II.

### C.       FMLA Interference Claim (Count III)

Temple contends that it is entitled to summary judgment on this claim because Mills

cannot establish that Temple interfered with her FMLA rights. "The FMLA grants eligible

employees the right to take up to twelve workweeks of leave in any twelve-month period if a

'serious health condition . . . makes the employee unable to perform the functions of the position

of such employee.'" *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007)

(quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA makes it unlawful for an employer "to interfere

with, restrain, or deny the exercise of or the attempt to exercise, any right provided under

[subchapter I of the FMLA]." 29 U.S.C. § 2615(a)(1). "To prevail on her interference claim,

[Mills] must prove that: (1) she was entitled to FMLA benefits; (2) [Temple] violated § 2615 by

'interfering with, restraining, or denying her exercise of FMLA rights;' and (3) she was

prejudiced by the interference." *Sconfienza v. Verizon Pa., Inc.*, 307 F. App'x 619, 621 (3d Cir.

Pa. 2008) (not precedential) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89

(2002)).

Mills argues that Temple interfered with her FMLA rights by requesting a new healthcare

provider certification before the expiration of her approved certification. *Cf. Hurt v. Ecolab, Inc.*,

No. 3-05-1508, 2006 U.S. Dist. LEXIS 32373, at *14-15 (N.D. Tex. May 23, 2006) ("[T]he court

has little difficulty concluding that defendant interfered with plaintiff's rights under the statute . .

. by requiring him to provide updated reports from his treating physician every two weeks.").

Under the FMLA, "[a]n employer may require that a request for leave . . . be supported by a

certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a).

"After the initial certification, an employee may require subsequent recertifications subject to the

restrictions set forth in 29 C.F.R. § 825.308." *Gibson*, 2007 U.S. Dist. LEXIS 99008, at *58. "If the medical certification indicates that the minimum duration of the condition is more than 30 days, an employer must wait until that minimum duration expires before requesting a recertification." 29 C.F.R. § 825.308(b). The employer may request recertification before that time, only if  "(1) The employee requests an extension of leave; (2) Circumstances described by the previous certification have changed significantly . . . or (3) The employer receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification." 29 C.F.R. § 825.308(c).

Temple does not dispute that it requested recertification from Mills in July 2009 before the expiration of her initial certification on November 26, 2009. Instead, it argues that this is a clear case of changed circumstances. According to Temple, Mills "went from no restrictions to substantial work-related restrictions in one day." (Reply at 2.) However, as Mills points out, Dr. Gupta stated in the initial certification he completed in May 2009 that she was restricted from filing. (Resp. Ex. B at 5.) Temple argues that Dr. Gupta informed Susan Latorre that Mills was only restricted from filing immediately following her epidural injections. Therefore, Temple contends that Mills had no doctor-imposed work-related restrictions until she presented Maureen Murphy with the letter from Dr. Gupta in July 2009.

Mills, on the other hand, contends that the circumstances described by her initial certification had not changed at all—let alone, significantly. Dr. Gupta denies ever speaking with Susan Latorre, and maintains that Mills was restricted from filing before, during, and after her injections. (Resp. Ex. R at 1.) I must accept his version of the facts for purposes of this motion. Furthermore, drawing all reasonable inferences in Mills's favor, as I must on summary judgment,

31

the fact that Mills first offered Murphy a copy of the Certification to establish her restrictions suggests that she and Dr. Gupta understood her medical condition to impose restrictions on her ability to file at least until November 26, 2009. There is also evidence that Mills had not, in fact, been filing from late 2008 through July 2009.

This is, quite simply, a genuine dispute of material fact that must be resolved by a jury, and thus I will deny summary judgment as to Count III.

### D.      Due Process Claim (Count IV)

Count IV of Mills's complaint states a claim for violations of the due-process clause of the Fourteenth Amendment to the United States Constitution. Mills, however, does not oppose Temple's motion for summary judgment as to this claim. (Resp. at 3 n.1.) Therefore, Mills has waived this claim, and I will enter judgment in favor of Temple and against Mills as to count IV.

## IV.   Conclusion

For the reasons explained above, I will deny in part and grant in part Temple's motion for summary judgment. An appropriate order follows.